**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

BAY AREA UNITARIAN UNIVERSALIST )
CHURCH; DRINK HOUSTON BETTER, )
LLC d/b/a ANTIDOTE COFFEE; and )
PERK YOU LATER, LLC, )
                               )
        *Plaintiffs*, )
    v. )
                               )
KEN PAXTON, Attorney General for the )      CIVIL ACTION NO. 4:20-cv-3081
State of Texas, in his official capacity; KIM )
OGG, District Attorney for Harris County, in )
her official capacity; CHRISTIAN )
MENEFEE, County Attorney for Harris )
County, in his official capacity; ED )
GONZALEZ, County Sheriff for Harris )
County, in his official capacity; PETE )
BACON, Acting Chief of Police for the )
Webster Police Department, in his official )
capacity; TROY FINNER, Chief of the )
Houston Police Department, in his official )
capacity; KIM LEMAUX, Presiding Officer )
for the Texas Commission on Law )
Enforcement, in her official capacity, )
                               )
        *Defendants*. )
_____ )

**MEMORANDUM OF LAW IN OPPOSITION TO WEBSTER
CHIEF OF POLICE PETE BACON'S MOTION TO DISMISS
FOR LACK OF SUBJECT MATTER JURISDICTION, OR IN THE
ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION ...............................................................................................................1

NATURE AND STAGE OF THE PROCEEDING ....................................................................2

    A.    The Texas Penal Code imposes detailed and burdensome requirements for trespass with a licensed firearm .............................................................2

    B.    Under Texas's criminal trespass scheme, the Church must choose between exercising its right to exclude those with licensed firearms and communicating in the manner of its choosing ...............................................3

    C.    Webster enforces Texas's regime .............................................................5

    D.    Procedural background ............................................................................6

ISSUES PRESENTED .........................................................................................................7

STANDARD OF REVIEW ...................................................................................................7

SUMMARY OF ARGUMENT ..............................................................................................8

ARGUMENT ....................................................................................................................9

I.    THE RECORD, VIEWED IN LIGHT OF APPLICABLE LAW, ESTABLISHES THAT THE CHURCH HAS STANDING ...........................................................................................9

    A.    The evidence and law establish that Texas's scheme concretely injures the Church ..............................................................................................10

        1.    The Church suffers at least four independently cognizable injuries.......................10

        2.    Webster's arguments are immaterial to the Church's injuries and, at any rate, are disproven by the record .........................................15

    B.    The evidence and law establish that the Church's injuries are fairly traceable to Webster.............................................................................17

    C.    The evidence and law establish that the Church's injuries are redressable by a favorable decision against Webster.............................................19

II.    THE CHURCH DOES NOT SEEK AN ADVISORY OPINION...............................................20

III.    UNDER THE APPLICABLE RULE 56 STANDARD, WEBSTER IS NOT ENTITLED TO SUMMARY JUDGMENT ON STANDING ........................................................................21

CONCLUSION ................................................................................................................22

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aetna Life Ins. Co. v. Haworth,*
  300 U.S. 227 (1937)............................................................................................21

*Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.,*
  851 F.3d 507 (5th Cir. 2017)..............................................................18, 19, 20

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)......................................................................................8, 22

*Arena v. Graybar Elec. Co.,*
  669 F.3d 214 (5th Cir. 2012)..................................................................................7

*Barrett Computer Servs., Inc. v. PDA, Inc.,*
  884 F.2d 214 (5th Cir. 1989)..................................................................................7

*Boy Scouts of Am. v. Dale,*
  530 U.S. 640 (2000)..........................................................................................14

*Brooks v. Dam,*
  126 F. App'x 173 (5th Cir. 2005).........................................................................7

*Brooks v. Snow,*
  313 F. Supp. 2d 654 (S.D. Tex. 2004)................................................................7

*California v. Texas,*
  141 S. Ct. 2104 (2021).......................................................................................19

*Cedar Point Nursery v. Hassid,*
  141 S. Ct. 2063 (2021).......................................................................................14

*City of Erie v. Pap's A.M.,*
  529 U.S. 277 (2000)..........................................................................................13

*Commonwealth of Massachusetts v. Mellon,*
  262 U.S. 447 (1923)..........................................................................................19

*Davis v. Fed. Election Comm'n,*
  554 U.S. 724 (2008)...........................................................................10, 11, 12

*Dep't of Com. v. New York,*
  139 S. Ct. 2551 (2019)...............................................................................14, 18

*Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n,*
  760 F.3d 427 (5th Cir. 2014)..............................................................................14

*Ex parte Young,*
  209 U.S. 123 (1908)..........................................................................................20

*Flast v. Cohen,*
  392 U.S. 83 (1968).............................................................................................21

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Green Valley Special Util. Dist. v. City of Schertz, Texas,*
    969 F.3d 460 (5th Cir. 2020) (en banc) ...................................................22

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
    515 U.S. 557 (1995)...................................................................................13

*K.P. v. LeBlanc,*
    627 F.3d 115 (5th Cir. 2010)............................................................... 17, 19

*Kipp Flores Architects, LLC v. Mid-Continent Cas. Co.,*
    No. 4:14-CV-02702, 2015 WL 10557922 (S.D. Tex. Mar. 13, 2015) .................7

*Koontz v. St. Johns River Water Mgmt. Dist.,*
    570 U.S. 595 (2013)....................................................................................8

*Larson v. Valente,*
    456 U.S. 228 (1982)..................................................................................19

*Lewis v. Knutson,*
    699 F.2d 230 (5th Cir. 1983).......................................................................9

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)................................................................................9, 13

*Meese v. Keene,*
    481 U.S. 465 (1987)..................................................................................13

*Montez v. Dep't of Navy,*
    392 F.3d 147 (5th Cir. 2004).......................................................................7

*Okpalobi v. Foster,*
    244 F.3d 405 (5th Cir. 2001) (en banc) ......................................................19

*Paterson v. Weinberger,*
    644 F.2d 521 (5th Cir. 1981).......................................................................8

*Pickett v. Texas Tech Univ. Health Scis. Ctr.,*
    37 F.4th 1013 (5th Cir. 2022).....................................................................7

*Quinones v. City of Evanston,*
    58 F.3d 275 (7th Cir. 1995).......................................................................18

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992)..................................................................................10

*Raines v. Byrd,*
    521 U.S. 811 (1997)..................................................................................21

*Reno v. ACLU,*
    521 U.S. 844 (1997)..................................................................................17

*Richardson v. Oldham,*
    12 F.3d 1373 (5th Cir. 1994).......................................................................8

**TABLE OF AUTHORITIES**

(continued)

Page(s)

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
    487 U.S. 781 (1988) ..................................................................................... 13

*S.W.S. Erectors, Inc. v. Infax, Inc.,*
    72 F.3d 489 (5th Cir. 1996) ......................................................................... 16

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ..................................................................................... 14

*Texas v. Yellen,*
    No. 2:21-CV-079-Z, 2022 WL 989733 (N.D. Tex. Mar. 4, 2022) .............. 8, 14

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,*
    535 U.S. 635 (2002) ..................................................................................... 19

*Virginia v. Hicks,*
    539 U.S. 113 (2003) ..................................................................................... 17

*Wooley v. Maynard,*
    430 U.S. 705 (1977) ..................................................................................... 12

**STATUTES**

Tex. Penal Code § 30.05 ............................................................................... *passim*

Tex. Penal Code § 30.06 ............................................................................... *passim*

Tex. Penal Code § 30.07 ............................................................................... *passim*

**OTHER AUTHORITIES**

Laylan Copelin, *Limiting guns as Texas businesses? It's a legal – and legalese – fight,*
    STATESMAN ..................................................................................................... 4

Fed. R. Civ. P. 12 ......................................................................................... *passim*

Fed. R. Civ. P. 30 ............................................................................................... 16

Fed. R. Civ. P. 56 ......................................................................................... *passim*

## INTRODUCTION

The Bay Area Unitarian Universalist Church ("the Church") wishes to exclude all firearms from its property. In light of its principles of inclusiveness and non-violence, the Church does not wish to engage individual entrants in colloquies about firearms; nor does it wish to cover the transparent glass doors at its entrance with large signs on the topic of firearms. Accordingly, it would prefer to communicate the message that firearms are not allowed on its premises by posting a single, simple, easy-to-read sign saying, "no guns allowed." Texas's trespass regime, however, does not allow this. Instead, Texas law requires the Church, in order to provide legally sufficient notice of its intent to exclude licensed firearms, to post two separate signs, written in both English and Spanish, with letters at least one inch tall displayed in "contrasting colors," which take up at least a combined ten square feet of space. *See* Tex. Penal Code §§ 30.06(c)(3), 30.07(c)(3).

The record shows that police in the City of Webster, where the Church is located, are trained that if a property owner posts non-conforming signs indicating a desire to exclude licensed firearms, that notice is legally inadequate; and that an individual who ignores such signs and enters private property anyway cannot be arrested for trespass on that basis. One incident report in the record confirms that Webster police officers responding to a trespass call relating to a visible firearm had to, and did, confirm that the restaurant making the call had posted a conforming § 30.07 sign. The record further establishes that many Texas gun owners closely track whether property owners' signage conforms to the burdensome requirements of §§ 30.06 and 30.07, and police are trained to respond to self-appointed "Second Amendment auditors," who actively test the boundaries of their ability to carry firearms on public and private property in Texas.

These facts, viewed in light of the Texas criminal trespass scheme, abundantly establish that the Church has suffered, and is suffering, a sufficient injury to have Article III standing. Texas subjects it to an asymmetrical notice scheme that singles out those who wish to exclude licensed firearms for

1

differential treatment. The scheme compels the Church to adopt a manner of expression offensive to it. The scheme has further coerced the Church into foregoing its right to exclude concealed, licensed firearms. And the scheme has thereby infringed the Church's associational freedom.

Notwithstanding all of this evidence, Webster argues the Church lacks standing to challenge the notice requirements of §§ 30.06 and 30.07 because it receives "equal [police] protection" from Webster regardless of signage. Webster Mot. Dismiss or Sum. J., ECF No. 156, at 16. But the Church does not argue that Webster would deny it police protection altogether if it did not post conforming signs. Rather, the Church argues—and the record shows—that unless the Church posts signs conforming to § 30.06(c) and § 30.07(c), Webster will not, and cannot, arrest individuals for trespass on the basis that they have ignored signs expressing the Church's intent to exclude and brought licensed firearms onto Church premises. That is enough to deny the Church the protection of Texas trespass law if it refuses to engage in burdensome government-scripted speech—not least because the Church cannot rely on the deterrent effect of the criminal law to exclude licensed firearm carriers if it does not post conforming signs. Thus, Webster—as the authority charged with enforcing Texas's regime against the Church—is a cause of its injuries. A favorable decision from this Court against Webster would therefore redress the Church's injury.

Webster also argues the Church seeks only an advisory opinion. This argument fails for the same reasons that its standing argument fails. The Church is presently and concretely injured.

This Court should therefore deny Webster's motion, whether it applies a Rule 12(b)(1) preponderance standard or the Rule 56 standard for summary judgment.

## NATURE AND STAGE OF THE PROCEEDING

### A.  The Texas Penal Code imposes detailed and burdensome requirements for trespass with a licensed firearm.

Sections 30.06 and 30.07 of the Texas Penal Code establish burdensome notice requirements for private-property owners who wish to exclude those carrying licensed firearms. The Texas Penal

Code allows owners who wish to exclude visitors for almost any reason to provide notice through signs "reasonably likely to come to the attention of intruders." Tex. Penal Code § 30.05(b)(2)(C). An intruder who enters the owner's property despite the posting of such a sign has committed the crime of trespass and is subject to police removal, arrest, and prosecution. *See* Tex. Penal Code § 30.05(d).

But under §§ 30.06 and 30.07, written notice of the property owner's intent to exclude people with licensed firearms is not valid unless it conforms to an onerous government script. These statutes require signs with particular phrasing, in large block letters at least one inch tall, in two languages, which take up at least ten square feet of space. Compl., ECF No. 1, ¶¶ 24-25, 75; Brandon Decl., Ex. G, App.[1] 204 ¶ 4.[2]

> **B.    Under Texas's criminal trespass scheme, the Church must choose between exercising its right to exclude those with licensed firearms and communicating in the manner of its choosing.**

*The Church and Its Interests.* The Church is located in Harris County, Texas, near the border of Houston and Webster. Brandon Decl., Ex. G, App. 203-04 ¶ 1. The Church receives governmental services, including police and prosecutorial services, from the City of Webster and Harris County. *Id.* at 207-08 ¶ 17. The Church professes a message of nonviolence, and, consistent with that message, it has an official policy of prohibiting all firearms on its grounds. *Id.* at 204 ¶¶ 2-3; *id.* at 210.

The Church displays on its front and side entrances signs that it believes to be compliant with § 30.07, to prohibit the open carry of handguns by license holders. *Id.* at 204 ¶ 4. Each of the signs measure 18 x 24 inches and the Church paid $111.80 to post them. *Id.* The Church believes that

---

[1] All record citations to the Appendix ("App.") herein refer to Plaintiffs' Appendix filed in support of their motion for summary judgment, ECF No. 155-2.

[2] As set forth in Plaintiffs' Motion for Summary Judgment, ECF No. 155, at 2-5, the general Texas trespass statute provides a complete defense to prosecution for those carrying licensed firearms, whether openly or concealed, when the basis for exclusion is the possession of a firearm. *See* Tex. Penal Code § 30.05(f). The Texas Penal Code then creates separate crimes for trespass when the basis for exclusion is that the entrant is openly carrying a licensed firearm (§ 30.06) or carrying a concealed firearm (§ 30.07). The notice requirements challenged here are set forth in these latter provisions.

posting the signs required by Texas's scheme "detract[s] from" the message the Church wants its entrance to convey—that it offers "a refuge for peace and tranquility"—"because [the signs] are a constant and imposing reminder of guns and violence." *Id.* at 206 ¶ 9.

The Church chooses not to post the § 30.06 signs because the burden on its expression would be too great. It would further detract from the Church's religious message, *id.* at 204 ¶ 4, and would turn entrants' thoughts immediately to guns and violence, *id.* at 206 ¶ 9; Zimmerman Decl., Ex. H, App. 217 ¶ 4. It would also impair the safety and accessibility of the Church building, as Church greeters need to be able to see through the clear glass doors to assess safety risks and determine whether congregants need assistance entering. Ex. G, App. 205 ¶ 6; *see also* Jourdan Expert Report, Ex. F, App. 196 ¶ 22 (the "relatively large, text heavy signs" required by §§ 30.06 and 30.07 will "[i]n many cases . . . block sightlines on glass doors"). The Church would rather communicate that guns are prohibited by posting a single, smaller sign in its own words, in a way that situates the firearm prohibition within the Church's larger religious philosophy. *See* Ex. G, App. 206 ¶ 11.

Texas's regime, however, forecloses that approach. The requirements of § 30.06(c)(3) and § 30.07(c)(3) provide no leeway to convey the Church's "no guns" message in a more positive way. *See* Ex. F, App. 195-96 ¶ 19. Instead, the regime offers a one-size-fits-none option, specifically designed to burden the expression of the Church's (and others') viewpoint. Indeed, the lead drafter of Texas's regime explicitly stated that it was created with both the purpose and effect of burdening the speech of those who wish to exclude guns.[3]

*Alternate Forms of Notice Are Even More Burdensome.* Sections 30.06 and 30.07 provide that, in lieu of posting compliant signs, a property owner may provide individualized notice that licensed firearms are prohibited, either orally or via card. But providing individual notice by either method places an

---

[3] *See* Laylan Copelin, *Limiting guns as Texas businesses? It's a legal - and legalese - fight*, STATESMAN, https://bit.ly/3FGZqT8 (last updated Dec. 11, 2018, 10:28 AM), Ex. B, App. 9.

even greater burden on the Church's speech than using signs, for three reasons. *See* Ex. G, App. 207 ¶¶ 14-16. First, because there is no way to know whether any given entrant has a concealed firearm, to provide effective notice the Church would have to give individual notice to every single person who enters the premises. *See id.*; Bacon Dep. Tr., Ex. E, App. 167-68. Second, the Church feels that a practice of providing individual notice to every churchgoer, either by card or orally, would substantially alter the religious experience it wishes to provide. Ex. G, App. 207 ¶¶ 15-16. Third, it is intimidating, uncomfortable, and scary for Church staff to confront an individual carrying a firearm to ask him or her to leave. *See generally* Ex. G, App. 207 ¶ 13.

### C.      Webster enforces Texas's regime.

The Webster Police Department, through Chief of Police Pete Bacon, enforces the laws of the State of Texas, including §§ 30.06 and 30.07, within the City of Webster. Ex. E, App. 134-37. Before making an arrest for a violation of §§ 30.05, 30.06, or 30.07, Webster officers must have probable cause to believe all elements, including the notice requirements, are satisfied. *Id.* at 138, 146-47 (stating that if any one requirement of §§ 30.06 or 30.07—such as block lettering at least one inch in height—is not satisfied, an individual who ignored the sign would not be in violation of the statute, and an officer could not make an arrest for violation of the statute). For this reason, Webster police officers are specifically trained on the nuances of the signage requirements under §§ 30.05, 30.06, and 30.07. *See* TCOLE Course 3184, Ex. O., App. 297, 312; TCOLE Course 3187, Ex. P, App. 350; Ex. E, App. 140, 171-87 (explaining this training is mandatory).[4]

---

[4] In September 2021, Texas House Bill 1927 became effective, which allows people over 21 years old to carry firearms without a license and amended the trespass code to set forth specific language for providing notice of a property owner's intent to exclude unlicensed firearms. This development post-dates the filing of Plaintiffs' Complaint, but it is relevant to record materials that discuss the current signage requirements under §§ 30.05(c), 30.06(c), and 30.07(c).

This training is not theoretical—Webster's officers put it into practice. For example, on June 4, 2017, Webster responded to a call for service at a Cheddars restaurant involving a person carrying a concealed weapon. *See* Event Report, Ex. T, App. 420; Ex. E, App. 161. Chief Bacon testified, based on his review of the Event Report, "[a]t some point, the weapon was observed, apparently by management, resulting in a call [to] the police department." Ex. E, App. 161. The event report states that Cheddars "DOES HAVE 30.07 POSTED," indicating that responding officers reviewed the posted signage to assess whether Cheddars displayed a sign comporting with the requirements of that section. Ex. T, App. 420. Chief Bacon testified that "based on [the Event Report], I do not believe, to my knowledge, that Cheddars has a 30.06 sign posted." Ex. E, App. 162. And "[i]n the absence of a 30.06 sign, I do not believe that the officers would have the right to remove the gentleman from the premises, unless Cheddars, again, insisted." *Id.* at 162-63.

### D.   Procedural background.

Plaintiffs, including the Church, filed this suit against Webster and other state and local officials. ECF No. 1. All Defendants moved to dismiss; this Court granted their motions only in part, allowing Plaintiffs' as-applied First Amendment claims to move forward. ECF No. 68. Later, Plaintiffs voluntarily dismissed the two State Defendants, Kim Lemaux and Ken Paxton. ECF No. 82. In December 2021, the Chief of the Houston Police Department moved for judgment on the pleadings, arguing in part that Plaintiffs lacked standing. ECF No. 115. On September 29, 2022 this Court granted his motion. ECF No. 146. The Plaintiffs thereafter moved for leave to file an amended complaint, a motion that remains pending. ECF No. 150.

Webster now moves to dismiss the Church's remaining claims under Rule 12(b)(1); in the alternative, it moves for summary judgment under Rule 56.

## ISSUES PRESENTED

The first issue presented is whether this Court lacks subject matter jurisdiction, so that the case should be dismissed, because the Church either (1) has failed to show Article III standing, or (2) seeks an advisory opinion. The second, alternative issue presented is whether Webster is entitled to "summary judgment because no reasonable factfinder could conclude Webster has denied police protection based on compliance with" Texas's regime. ECF No. 156, at 25.

## STANDARD OF REVIEW

Webster purports to advance a factual attack to this Court's jurisdiction under Rule 12(b)(1). *See id.* at 14-15. As a general matter, on such a motion, the "plaintiff bears the burden of proof that jurisdiction does in fact exist," and the Court may "weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Arena v. Graybar Elec. Co.*, 669 F.3d 214, 223 (5th Cir. 2012) (citations omitted). However, the Fifth Circuit recognizes an important and oft-invoked exception to the general rule: Where "issues of fact are central both to subject matter jurisdiction and the claim on the merits," *Montez v. Dep't of Navy*, 392 F.3d 147, 150 (5th Cir. 2004), "the decision should await a determination of the merits either by the district court on a summary judgment motion or by the fact finder at trial," *Pickett v. Texas Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1019 (5th Cir. 2022) (citation omitted); *see also Barrett Computer Servs., Inc. v. PDA, Inc.*, 884 F.2d 214, 219 (5th Cir. 1989) (noting that "challenges to standing [under such circumstances] are frequently resolved in summary judgment proceedings—where the nonmovant is granted all reasonable factual inferences and the movant cannot succeed unless the court finds that no genuine issue of material fact exists—or at a trial on the merits"); *Brooks v. Snow*, 313 F. Supp. 2d 654, 658 (S.D. Tex. 2004) (Werlein, J.) ("If, however, the facts necessary to sustain jurisdiction implicate the merits of the plaintiff's cause of action, then the court must proceed as it would under [Rule] 12(b)(6) or, in a proper case, Rule 56."), *aff'd sub nom. Brooks v. Dam*, 126 F. App'x 173 (5th Cir. 2005); *Kipp Flores Architects, LLC v. Mid-Continent Cas. Co.*, No. 4:14-

CV-02702, 2015 WL 10557922, at *7-8 (S.D. Tex. Mar. 13, 2015) (recommending denial of Rule 12(b)(1) and 12(b)(6) motions challenging standing where jurisdictional factual issues were intertwined with the merits), *report and recommendation adopted*, 2015 WL 12778803 (June 5, 2015).

Here, the jurisdictional facts that Webster challenges are intertwined with the merits. If the Church is correct on the merits—that Texas's regime imposes "an 'unconstitutional condition'" on its access to the benefits of trespass law—that "is a 'constitutionally cognizable injury,'" thus conferring standing. *Texas v. Yellen*, No. 2:21-CV-079-Z, 2022 WL 989733, at *5 (N.D. Tex. Mar. 4, 2022) (quoting *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 607 (2013)). Accordingly, Webster's motion should be evaluated under the Rule 56 standard for summary judgment.

Under that familiar standard, this Court may not weigh the evidence or make "[c]redibility determinations," *Richardson v. Oldham*, 12 F.3d 1373, 1379 (5th Cir. 1994), and Webster's motion may be granted only if the evidence is such that no "reasonable jury could return a verdict for the" Church, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Even if the Court applies the Rule 12(b)(1) standard, however, the Church easily carries the burden of showing, by a preponderance of the evidence, that it has standing to pursue its claims in federal court. *See, e.g.*, *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981); *Yellen*, 2022 WL 989733, at *5.

## SUMMARY OF ARGUMENT

**I.** The Church satisfies the Rule 12(b)(1) standard for demonstrating its standing. The Church is injured as a matter of law because the challenged statutes regulate its speech on the basis of content and viewpoint. Unlike property owners wishing to exclude entrants for any reason *other* than firearm possession, the Church must choose between burdensome individualized notice or posting statutorily mandated signs that take up valuable space on its doors and detract from its religious message.

These injuries are traceable to Defendant Bacon and would be redressed by a favorable decision. Defendant Bacon is responsible for enforcing the challenged statutes where the Church is

located. Because Defendant Bacon and officers employed by the Webster Police Department enforce the challenged statutes *as written*—as they must—the Church must adhere to the statutory notice requirements to secure the benefits of Texas trespass law, including its deterrent effect. If the Court enjoins the burdensome notice requirements, the Church will be free to communicate, in a manner consistent its religious tenets and expressive preferences, the message that firearms are unwelcome on its property, while retaining its right to exclude backed by Texas trespass law.

**II.** For largely the same reasons, the Church does not seek an advisory opinion. The Church's First Amendment injuries are presently occurring and not hypothetical.

**III.** Under the applicable Rule 56 standard, Webster is not entitled to summary judgment regarding standing, because the record evidence adduced by the Church demonstrates, at a minimum, several genuinely disputed material facts going to its standing. However, if the Court disagrees and grants Webster's motion to dismiss for lack of standing, this dismissal must be without prejudice— since the ruling would not be on the merits.

## ARGUMENT

### I.   THE RECORD, VIEWED IN LIGHT OF APPLICABLE LAW, ESTABLISHES THAT THE CHURCH HAS STANDING.

On a factual challenge to standing under Rule 12(b)(1), the court should dismiss the complaint only if "the plaintiff's standing does not adequately appear from all materials of record." *Lewis v. Knutson*, 699 F.2d 230, 237 (5th Cir. 1983) (citation omitted). This Court must therefore consider not only the record materials relied upon by Webster but also those offered by the Church.

To establish Article III standing, a plaintiff must show (1) an injury in fact that is (2) fairly traceable to the challenged action of the defendant and (3) likely redressable by a favorable ruling. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Even if this Court applies a Rule 12(b)(1) standard and places the burden on the Church to show standing by a preponderance of the evidence, *but see supra* at 7-8, the Church has established its standing.

A.   **The evidence and law establish that Texas's scheme concretely injures the Church.**

Texas's scheme injures the Church in at least four ways: (1) it unevenly burdens the Church's expression, (2) it mandates a manner of speech that the Church finds offensive, (3) it forces the Church to forego excluding concealed firearms, and (4) it impairs the Church's freedom to associate with only unarmed entrants. *See* ECF No. 155 at 12-15. Each of these injuries is sufficiently concrete and legally cognizable to satisfy Article III standing requirements, and as explained below, Webster's arguments do not alter this analysis.

1.   **The Church suffers at least four independently cognizable injuries.**

*Texas's Scheme Unevenly Burdens the Church's Viewpoint.* Before the Church even posted its no-guns signs, and regardless of whether the Church ever made any call to City of Webster police, the Church already suffered cognizable Article III harm, simply by being subjected to Texas's lopsided, viewpoint-discriminatory scheme.

The First Amendment mandates evenhanded treatment of differing speakers and viewpoints. The government may not "license one side of the debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992). Nor may the government selectively burden speech or speakers that it disfavors, as such "asymmetrical" regimes also violate the First Amendment. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734-35 (2008). And anyone whose speech is subjected to an asymmetrical regime suffers a First Amendment injury sufficient for standing, even if the burden threatened by the regulatory regime is never "actualized." *Id.* at 734 (finding Davis had standing even though his opponent opted out of the challenged contribution limits).

So it is here. Texas's trespass scheme burdens the expression only of property owners seeking to exclude firearms, limiting their choices for how to express this intent. They may use only oral notice or strictly circumscribed forms of written notice. *See* Tex. Penal Code §§ 30.06(c)(3), 30.07(c)(3). Those

who seek to exclude entrants for *any other reason* are treated more favorably. They may use any "oral or written communication" or post any sign that is "reasonably likely" to notify entrants "that entry is forbidden." *Id.* § 30.05(b)(2)(A), (b)(2)(C).

As in *Davis*, the Church suffers an injury sufficient to confer Article III standing simply by being subjected to this asymmetrical regime. *See* 554 U.S. at 734 (finding Davis "faced such an injury" after "declar[ing] his candidacy and his intent to spend more than $350,000 of personal funds in the general election campaign"). The Church wishes to exclude firearms from its place of worship. At the outset, it faces a set of burdensome choices that are different from those of property owners who wish to exercise their right to exclude on any other basis. It can provide oral notice, but this is impracticable, because it is impossible to give oral notice to entrants carrying concealed handguns unless oral notice is given to *every* entrant. Equally important, providing such individual oral notice is contrary to the welcoming, non-confrontational message that the Church wishes to convey when it opens its doors for services, because it would require a staff member to engage in a colloquy about guns with every person entering the Church. *See* Ex. G, App. 207 ¶¶ 13-16. The Church could also distribute cards carrying government-specified text to every entrant, *see* Tex. Penal Code §§ 30.06(c)(3)(A), 30.07(c)(3)(A), but that would be just as impracticable and burdensome and would also require the Church to parrot government-scripted language. If the Church chooses instead to post signs indicating its intent to exclude licensed firearms, however, it must adopt Texas's prescribed message, word for word, printed in inch-high letters, via signs produced at its own expense.

Compare that to a property owner who wants to exclude anyone who does *not* have a firearm. That property owner too might find oral notice, or written notice by card, to be impracticable, because it is impossible to know if someone is carrying a concealed firearm. But the firearm-welcoming property owner could then post a sign saying merely, "No entry allowed unless armed"—or anything else that reasonably notifies unarmed entrants to keep out. *See* Tex. Penal Code § 30.05(b)(2)(C).

11

This asymmetry is a cognizable First Amendment injury. *See Davis*, 554 U.S. at 734. It would not matter, for standing purposes, if the Church ever posted compliant signs or even if it exercised its right to exclude firearms *at all*. In *Davis*, the Supreme Court held that the plaintiff had standing even though "[w]hen Davis commenced this action, his opponent had not yet qualified for the asymmetrical limits, and later, when his opponent did qualify to take advantage of those limits, he chose not to do so." *Id.* For Article III purposes, it was enough that Davis faced a choice between self-funding his campaign as he wished—and giving his opponent the option of more favorable donation limits—or foregoing his preferred form of speech in order to avoid that burden. *See id.* at 734-35. In the same way, it is enough that the Church wants to exclude those carrying firearms and is subjected to Texas's asymmetrical notice scheme for doing so. And, as discussed below, this injury is entirely independent of any factual questions regarding whether and how Webster would provide police protection; by the time police protection is implicated, the Church has already been injured.

*Texas's Scheme Compels a Manner of Expression Offensive to the Church.* The Church also suffers an independent injury because it has posted, contrary to its preferences, the signs required by § 30.07.[5]

Being forced by the government to convey a message is undoubtedly a cognizable First Amendment injury for standing purposes. *See Wooley v. Maynard*, 430 U.S. 705, 714-15 (1977) (compelling display of state's motto on a license plate violated the First Amendment). So is being told *how* to speak. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 790-91 (1988) ("[W]e presume that speakers, not the government, know best *both* what to say and *how* to say it." (emphases added));

---

[5] Webster misrepresents the record on this score, asserting that the Church "does not display any of the signs [the Church] allege[s] are required." ECF No. 156, at 11 (citing ECF. No. 1, at 18 ¶ 61). As the Church alleged in the original Complaint (and has since supported with evidence), "[t]he Church displays only the signs required under the Open Carry Trespass Law because displaying signs under both the Open Carry Trespass Law and the Concealed Carry Trespass Law would have taken up too much space on the doorways and would be too obtrusive." ECF No. 1, at 18 ¶ 61; *see also* Ex. G, App. 204 ¶¶ 3-4 (testifying to the same).

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (similar). Even mandating a slight alteration in a speaker's mode of expression is a cognizable injury. The First Amendment recognizes, for example, a harm where the government compels a dancer who would prefer to be nude to wear a g-string, *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000), as well as when it mandates labeling certain films "political propaganda," even if they may still be displayed, *Meese v. Keene*, 481 U.S. 465, 473 (1987).

It follows that the Church is injured by posting the § 30.07 signs, because the manner of expression § 30.07 imposes offends the Church on practical, religious, and aesthetic grounds. Ex. G, App. 204-07 ¶¶ 3-4, 6-11, 15-16; *cf. Lujan*, 504 U.S. at 562-63 (reasoning that the plaintiffs' desire to observe wild animals "for purely esthetic purposes" would be "undeniably a cognizable interest for purpose of standing"). The Church would rather post a "simpler, smaller sign," *id.* at 206 ¶ 11, because doing so would least detract from its congregants' religious experiences, save space on its doors for other religious messaging, and ensure that personnel can adequately perceive security threats through the glass doors, *id.* at 205-06 ¶¶ 6-12.

*The Church Has Foregone Its Right to Exclude Concealed Firearms.* The unconstitutional scheme at issue has already had its intended, injurious effect: the Church has opted not to post § 30.06 signs rather than engage in additional government-scripted speech above and beyond the § 30.07 signs. Ex. G, App. 204 ¶ 4. It also does not provide individualized notice to every entrant to its premises, because this would burden its speech and detract from its desired message. *Id.* at 207 ¶ 15. That means it is not exercising its right to exclude licensed, concealed firearms, even though it wants to—indeed, the Church's official policy is to exclude *all* firearms. *Id.* at 204 ¶¶ 2-3. This is an independent injury to its property rights. *Cf. Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021) ("The right to exclude is 'one of the most treasured' rights of property ownership." (citation omitted)).

*Texas's Scheme Injures the Church's Freedom of Association.* Relatedly, Texas's scheme separately injures the Church's right to associate with only unarmed entrants. *See, e.g.*, *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000); Ex. G, App. 204-07 ¶¶ 2-4, 6-10, 14-16. As the record shows, Texas's convoluted scheme emboldens members of the public to flout what they perceive as inadequate signage attempting to exclude licensed firearms, *see* Ex. J, App. 228; D. Callaway Dep. Tr., Ex. K, App. 245-59, 264-66, making it exceedingly difficult for the Church to exclude firearm carriers. And the carrying of weapons transgresses the Church's most fundamental religious beliefs, including conversation-based conflict resolution, nonviolence, love, and compassion. Ex. G, App. 206 ¶ 8; *id.* at 210. While the injury to the Church's associational rights turns on the actions of third parties, where the evidence shows that "third parties will likely react in predictabl[y harmful] ways" absent judicial intervention, that is enough for standing. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). All that is required is "a substantial risk that" the Church will suffer a harm to its associational freedom. *See id.* at 2565 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

*That the Church Could Choose Other Forms of Notice or Forego Its Right to Exclude Does Not Undermine Its Standing.* It does not alter the standing analysis that the Church could, in theory, choose other forms of notice or not to exclude licensed firearms at all. As already noted, the other forms of available notice are even more burdensome for the Church. And relinquishing its right to exclude licensed concealed firearms is another form of injury. Texas's trespass regime puts an unconstitutional choice to the Church: either abandon its religious and expressive preferences and adopt the signs compelled by Texas, or abandon its right to rely on Webster police—and the deterrent effect of the criminal law—to exclude firearms using trespass, thereby foregoing its fundamental property right to exclude. Being faced with this choice is a cognizable injury for standing purposes. *See Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n*, 760 F.3d 427, 434 (5th Cir. 2014) (finding standing to assert unconstitutional-conditions claim); *Yellen*, 2022 WL 989733, at *5 (same).

### 2.     Webster's arguments are immaterial to the Church's injuries and, at any rate, are disproven by the record.

For all of these reasons, the record establishes, by a preponderance of the evidence, that the Church has standing to bring its First Amendment claims. Webster's contrary argument regarding injury boils down to a single point: it claims the Church is uninjured because Webster provides "police protection" "[r]egardless of whether a property owner posts the signs identified [in] §§ 30.06 or 30.07." ECF No. 156, at 20. This argument obfuscates the issues at hand with an imprecise and irrelevant definition of "police protection." To the extent it is responsive to the Church's actual arguments, it is factually wrong. Finally, it ignores that Plaintiffs' property rights rely on the deterrent effect of the criminal law.

At the outset, Webster's argument rests on an overly broad definition of "police protection": "investigat[ing] and respond[ing] to trespass and other calls." ECF. No. 156, at 20. This definition misses the point. The Church has never argued that if it does not post the §§ 30.06 and 30.07 signs, the Webster police will refuse altogether to come when called (for trespass or any other call), or that they will refuse to investigate when they arrive. The question is what happens next: when the Webster police respond, after they investigate, could they arrest someone for trespass on the ground that she ignored *non-conforming* signage and brought a licensed firearm onto Church premises?

The record abundantly demonstrates that they could not and would not. Chief Bacon himself testified that, absent compliant signage banning concealed carry—signage that conforms to such detailed specifications as, for example, using block lettering—an officer may not remove a concealed-gun carrier from the premises for trespass. Ex. E, App. 138, 147; *id.* at 161-64 (similar). Other evidence in the record confirms this. *See* Ex. O, App. 312 ("Importantly, though, the owners must have the applicable (i.e., separate) signage *for each type* of carriage they wish to prohibit. If they want to prohibit both types[,] [i.e., open and concealed carry,] *there must be two separate signs*."). The record even contains an incident report that shows that when responding to a trespass call involving a visible firearm,

Webster police confirmed that § 30.07 signs were posted as part of their investigation. Ex. T, App. 420; Ex. E, App. 161-63 (describing Cheddars event report).

Chief Bacon's self-serving declaration is not to the contrary. He does not claim that he or his officers ignore the plain terms of Texas law and arrest entrants for trespass when the property owner's posted notice fails to satisfy the requirements of § 30.06(c)(3) or § 30.07(c)(3). He states only that Webster "has not withheld police protection in the past [based] on any individual's or entity's failure to comply with the Acts' notice provisions." ECF No. 156, at 20 (citing ECF No. 156-2, at 3 ¶ 8). But that, again, is not what the Church argues. (In any event, if there were any actual contradiction between Chief Bacon's declaration and his deposition testimony, this Court should credit the latter. *See, e.g.*, *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 496 (5th Cir. 1996).)

Nor does the individual fact testimony of Sharlene Rochen—who was not deposed as a 30(b)(6) witness on behalf of the Church—support Webster's position. Webster cites her testimony that Webster has "always responded promptly whenever the Church called for service, the Officers behaved professionally"; and when they responded to a past incident, "[Ms.] Rochen could not think of anything she would have wanted a responding officer to have done differently." ECF No. 156, at 20. The specific incident described by Ms. Rochen did not involve a firearm of any kind, so this testimony is irrelevant.[6] But more generally, the Church does not argue that Webster has a blanket policy of ignoring its calls for police assistance or treating it poorly because it does not post § 30.06 signs. Rather, the Church argues that Webster enforces Texas law as written and so cannot arrest someone for trespass with a licensed firearm if it has provided notice that is defective under the plain terms of the statute—however polite and professional responding officers may be.

---

[6] Webster vaguely refers to other calls for service to the Church, but describes in particular only one— the call by Ms. Rochen, which did not involve a firearm. ECF No. 156, at 11.

Finally, and just as important, Webster's argument ignores the crucial deterrent effect that the criminal law has in safeguarding property rights. *See Reno v. ACLU*, 521 U.S. 844, 872 (1997) (recognizing the deterrence that flows from "[t]he severity of criminal sanctions"); *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (similar). The record is replete with evidence showing that gun owners are intimately familiar with the specific notice requirements of §§ 30.06 and 30.07 and are emboldened to exploit technically nonconforming signage. *See* Ex. K, App. 264-65; Ex. J, App. 226-33; Sealed Ex. A, ECF No. 151-1 ¶ 43. Hence, were the Church to post a non-conforming sign saying "No guns allowed"—a manner of expression that would not offend the Church—it would forego the protection that the deterrent effect of the trespass law provides to its property rights. Put differently, were it not for Texas's burdensome notice scheme, someone carrying a gun would be deterred from entering any premises when faced with a sign saying, "No guns allowed," because disobeying the sign may be met with a criminal prosecution for trespass. *See* Tex. Penal Code § 30.05(b)(2)(C). But under the current law, that person can enter with impunity. *See* ECF No. 155, at 27. And it is immaterial whether, *after* that person entered, if the Church called the police and asked to have him forcibly removed, Webster police would do so. The Church wants the ability—like every other property owner—to exclude that person *in the first place*, by deterring him from entering using reasonable notice.

**B.     The evidence and law establish that the Church's injuries are fairly traceable to Webster.**

Standing's second element requires the Church to show that its injuries are fairly traceable to Webster. It has done so. *See* ECF No. 155, at 21-22. Webster's arguments regarding traceability are misplaced.

Traceability is a low bar—it should not be confused with assessing an injury's "proximate cause." *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010). Rather, traceability is satisfied if Webster is "among those who cause [the Church's] injury." *Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 514 (5th Cir. 2017). That standard is indisputably met here.

Webster's police officers are trained on, and are duty-bound to enforce as written, the notice requirements of Texas's scheme, which require that if owners "want to prohibit both [open and concealed carry,] . . . *there must be two separate signs*." Ex. O, App. 312; *see also* Ex. E, App. 162-63 (Chief Bacon testifying that, if a property did not have a § 30.06 sign prohibiting concealed carry, officers could not remove a patron for carrying concealed). But for Webster's adherence to the §§ 30.06 and 30.07 notice requirements, the Church could post non-conforming signs—thus resolving its First Amendment objections—and still rely on the deterrent effect of the criminal law backed by Webster's readiness to remove gun carriers for trespass. *See Dep't of Com.*, 139 S. Ct. at 2565; *supra* at 14-16. In that respect, this case is similar to *Air Evac*, where the state officials—who were responsible for, among other things, resolving fee disputes lodged by the plaintiff and enforcing the balance-billing prohibition that the plaintiff challenged—were "among those who cause[d]" the plaintiff's injuries, even if others also contributed to the plaintiff's ultimate harm. *See* 851 F.3d at 514. Just as the officials in *Air Evac* applied a "fair and reasonable" reimbursement rate to determine the federal plaintiff's rights, *id.* at 511, and then enforced that determination against the plaintiff, Webster police officers apply the detailed requirements of § 30.06(c)(3) and § 30.07(c)(3) to determine the federal plaintiff's rights—here, whether the Church has effectively asserted its right to exclude. As in *Air Evac*, traceability is satisfied because Webster is part of the causal chain leading to the Church's injuries.

Webster's sole counterargument is that any injury is traceable only "to the State of Texas, not Webster." ECF. No. 156, at 22. But "[a] discriminatory state law is not a *defense* to liability under federal law" for the municipal actor that applies it; "it is a *source* of liability under federal law." *Quinones v. City of Evanston*, 58 F.3d 275, 277 (7th Cir. 1995) (Easterbrook, J.); *see also id.* (noting that "[a] person aggrieved by the application of a legal rule does not sue the rule maker," but "the person whose acts hurt him"). Because it enforces Texas's regime as written—and, but for that enforcement, the Church would not be injured—those injuries are traceable to Webster.

18

**C.**   **The evidence and law establish that the Church's injuries are redressable by a favorable decision against Webster.**

Finally, the Church has established redressability, which requires showing only that a favorable decision likely "will relieve a discrete injury," *not* that it will relieve "*every* injury." *K.P.*, 627 F.3d at 123 (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)); *see also* ECF No. 155 at 22-23. Since Webster has "definite responsibilities relating to the application of" Texas's trespass regime, *Air Evac EMS*, 851 F.3d at 507 (citation omitted), a declaration and injunction placing appropriate boundaries on the way it carries out its responsibilities will redress the Church's injuries. A declaration that Texas's scheme compels a manner of expression as an unconstitutional condition to obtain the benefits of trespass law, and an injunction limiting Webster officials' enforcement accordingly, would provide complete relief to the Church. *See* ECF No. 155, at 23.

Webster disagrees, asserting that, because "an injunction against the State's Acts or enforcement of the Acts will not alter any action by the Webster Police Department[,] . . . [a] judicial decision in favor of Bay Area against Webster will not redress any of the alleged wrongs of the state legislative act of which Plaintiffs complain." ECF No. 156, at 23. This misunderstands the nature of a federal action seeking to relieve a constitutional injury. A federal court cannot strike down a state law "in the abstract," *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (citation omitted); it can provide only prospective declaratory and injunctive relief against state actors that have a connection with enforcing the law, *id.* (federal courts enjoin "the acts of the official [enforcing the statute], the statute notwithstanding" (quoting *Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923))); *see also Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002); *Okpalobi v. Foster*, 244 F.3d 405, 414 (5th Cir. 2001) (en banc). Since Webster is charged with ensuring the Church has complied with the conditions of Texas's trespass regime before removing entrants for trespass, an injunction against Webster would redress the Church's injuries.

Indeed, to take Webster's argument seriously would effectively erase *Ex parte Young* and its progeny from the books. That doctrine allows equitable relief against all "individuals who . . . are clothed with some duty in regard to the enforcement of the laws of the state . . . [where that enforcement] violat[es] the Federal Constitution." *Air Evac EMS*, 851 F.3d at 516 (quoting *Ex parte Young*, 209 U.S. 123, 155-56 (1908)). Because Webster has a duty to enforce Texas's regime, ECF No. 156, at 8 n.5 (conceding this), that enforcement may be enjoined where, as here, it violates the Church's First Amendment rights.

## II.    THE CHURCH DOES NOT SEEK AN ADVISORY OPINION.

Webster next argues that the Court lacks jurisdiction because the Church "seeks an advisory opinion." ECF No. 156, at 23. Each of its supporting points reiterate its standing arguments, so they fail for the reasons already stated. Nonetheless, the Church separately addresses them here.

Similar to its overbroad definition of "police protection," *see supra* at 15-16, Webster claims that this concrete controversy—which has been further sharpened by the voluminous evidence now on record—presents only a "hypothetical[]" question. ECF No. 156, at 24. It asserts (citing nothing) that "Webster can neither defend nor resolve a suit where the question framed is not based on the actual policies and procedures of its police department but the hypothetical policies and procedures of Bay Area's imagination." *Id.* at 24-25. This is sophistry. The issues in this case are framed by the notice requirements inscribed on the face of Texas's trespass regime, *see* Tex. Penal Code §§ 30.06(c), 30.07(c), and as implemented by Webster:

- Webster's officers are specifically trained on the notice requirements that the Church challenges, Ex. O, App. 312 (noting "*two separate signs*" are required to give notice to both open and concealed firearm carriers); Ex. P, App. 350; Ex. E, App. 140-41, 171-87 (explaining this training is mandatory);

- According to Chief Bacon's own deposition testimony, the notice requirements are enforced *as written* by Webster police officers, Ex. E, App. 146-47, 154-55; and

- As Webster's own police report shows, when officers respond to calls for service implicating the firearm trespass statutes, they assess the property's signage to ensure compliance, Ex. T, App. 420 (Cheddars event report); Ex. E, App. 161-63 (describing Cheddars event report).

Given this record evidence, as well as all of the evidence discussed above, *see supra* Part I, the issues are sufficiently concrete to present a dispute that would resolve "the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937). The record speaks for itself. *See* Ex. O, App. 312; Ex. P, App. 350; Ex. E, App. 140-41, 161-63, 171-87; Ex. T, App. 420. And, unlike the plaintiffs in the two cases upon which Webster relies, the Church has never purported to assert taxpayer standing, *see Flast v. Cohen*, 392 U.S. 83, 101 (1968), or (even further afield) legislative standing, *see Raines v. Byrd*, 521 U.S. 811, 820-27 (1997). These cases are thus inapposite.

### III. UNDER THE APPLICABLE RULE 56 STANDARD, WEBSTER IS NOT ENTITLED TO SUMMARY JUDGMENT ON STANDING.

The foregoing assumes, for the sake of argument, that the general Rule 12(b)(1) standard for a factual challenge to jurisdiction applies and that the Church bears the burden of showing, by a preponderance of the evidence, that it has standing. It further assumes that this Court can properly resolve disputed issues of fact on this motion. But as set forth above, under well-developed Fifth Circuit precedent, the general Rule 12(b)(1) standard does not apply. Rather, because the question of standing is inextricably intertwined with the merits of the Church's First Amendment claims, the correct standard to apply is the Rule 56 summary judgment standard. *See supra* at 7-8. This Court should therefore treat Webster's motion as seeking summary judgment—as Webster asks in the alternative. ECF No. 156, at 15.

Under the Rule 56 standard, Webster's motion must be denied if, viewing the evidence in the light most favorable to the Church, there are any disputed questions of material fact remaining for trial. *See Anderson*, 477 U.S. at 248. The Church's evidence, discussed above, establishes by a preponderance of the evidence that it has standing. *See supra* Part I. *At a minimum*, the same evidence

establishes that there remain triable issues of fact going to intertwined standing and merits issues. Summary judgment in Webster's favor is therefore inappropriate.

Finally, if this Court does choose to apply the Rule 12(b)(1) standard and resolve disputed issues of fact before a trial is held, it should tailor the relief it grants accordingly. On a Rule 12(b)(1) motion, the ordinary course is to dismiss the complaint without prejudice, because the dismissal is on jurisdictional, rather than merits, grounds. *E.g.*, *Green Valley Special Util. Dist. v. City of Schertz, Texas*, 969 F.3d 460, 468 (5th Cir. 2020) (en banc).

## CONCLUSION

For the foregoing reasons, the Court should deny Webster's motion to dismiss for lack of subject-matter jurisdiction or, in the alternative, motion for summary judgment.

Dated: November 22, 2022

Respectfully submitted,

*/s/ William R. Taylor*

Alla Lefkowitz
*Admitted pro hac vice*
Andrew Nellis
*Admitted pro hac vice*
EVERYTOWN LAW
P.O. Box 14780
Washington, DC 20044
Telephone: (202) 545-3257, ext. 1007
alefkowitz@everytown.org
anellis@everytown.org

Ryan Gerber
*Admitted pro hac vice*
Laura Keeley
*Admitted pro hac vice*
EVERYTOWN LAW
450 Lexington Avenue
P.O. Box 4184
New York, NY 10017
Telephone: (646) 324-8198
rgerber@everytown.org
lkeeley@everytown.org

William R. Taylor
Attorney-in-Charge
TX State Bar No. 24070727
wrtaylor@jonesday.com
JONES DAY
717 Texas
Suite 3300
Houston, Texas 77002
Telephone: +1.832.239.3860
Facsimile: +1.832.239.3600

Peter C. Canfield
*Admitted pro hac vice*
pcanfield@jonesday.com
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, GA 30309
Telephone: +1.404.521.3939
Facsimile: +1.404.581.8330

Charlotte H. Taylor
*Admitted pro hac vice*
Lesley Roe
*Admitted pro hac vice*
ctaylor@jonesday.com
lroe@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: +1.202.879.3939
Facsimile: +1.202.626.1700

Calland M. Ferraro
*Admitted pro hac vice*
JONES DAY
901 Lakeside Ave. E
Cleveland, OH 44114
216-586-7088

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2022, I electronically filed a true and correct copy of the foregoing document with the Clerk of the District Court of the Southern District of Texas by using the CM/ECF system, which will send notification to all participants in the case who are registered CM/ECF users.

*/s/ William R. Taylor*
William R. Taylor